RAYMOND E. AND DEBORAH L. GRACE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Grace v. Commissioner
Docket No. 17365-84.
United States Tax Court
T.C. Memo 1986-304; 1986 Tax Ct. Memo LEXIS 301; 51 T.C.M. (CCH) 1484; T.C.M. (RIA) 86304; July 23, 1986. Larry Kars, for the petitioners. Terence D. Woolston, for the respondent. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Judge: Respondent determined deficiencies in petitioners' joint Federal income taxes as follows: *303 Year
Deficiency
1977
$668.00
1978
1,193.00
1980
2,699.00
After concessions, the issues for decision are: (1) whether petitioners are entitled to claim an investment credit pursuant to section 38[1] for 1980 and investment credit carry-backs for 1977 and 1978 relating to petitioner husband's [2] investment in JAM Productions, a partnership, and, (2) whether petitioners are entitled to deduct losses for 1980 relating to petitioner's investment in JAM Productions. [3]
*304 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners resided in Scottsdale, Arizona, when they filed their petition in this case. Petitioner was employed by Gerald Kramer, Ltd. as a certified public accountant during 1980. Petitioner was supervised by Gerald Kramer and Edwin W. Balder. ("Edwin Sr.") In the course of his employment, petitioner prepared tax returns. As a certified public accountant, petitioner was aware of different types of business operations and knew of risks associated with a general partnership. In 1980 petitioner invested in JAM Productions ("JAM") which purportedly leased a master recording from UM Leasing Corp. ("UM"). UM was a corporation formed on June 10, 1980, by Stephen Hill. William Medina ("Medina") was the president of UM and a director. In 1980 UM acquired 82 master recordings from Banyan Productions, Inc. ("Banyan") owned by Jack Millman ("Millman"). [4] The master recordings were subsequently leased to third parties including JAM. The purchase price for each master recording was paid by a small cash downpayment *305 and a note in an amount generally equal to 98 or 99 percent of the stated purchase price. The notes were recourse. Banyan held approximately $100,000,000 in notes, secured by the master recordings, from UM attributable to the master recordings sold. However, Banyan did not investigate the financial condition of UM and had no reasonable expectation of repayment. UM was required to apply for registration of a claim of copyright with respect to the master recording. The purchase agreements purportedly gave UM the exclusive right to the master recordings. Banyan acquired the master recording subsequently leased to JAM from Al M. Biaggi. The cost of the master recording was $2,500 in cash. The rights given to Banyan were nonexclusive. With the master recording Banyan was to provide a title opinion prepared by Thomisina Reed, an attorney, and two appraisals of the master recording. UM accepted master recordings without title opinions. The appraisals for the master recording subsequently leased by JAM were prepared *306 by Robert Scherl and Sye Mitchell. By the spring of 1981 the title to some of the master recordings had been challenged and in 1983 UM instituted suit against Banyan and Millman. In addition to problems with the title to some of the master recordings, UM was notified by lessees prior to the end of 1980 that the technical quality of some of the master recordings was not adequate. A UM employee listened to cassettes of the master recordings on receipt from Banyan and could have rejected any of inadequate technical quality. Master recordings are not normally sold in the music industry unless the seller is in bankruptcy or terminating its music business. When such a sale does occur, the buyer would check the registration certificate at the U.S. Copyright Office, if any, the artist's contract, the licenses for the writers and other materials which would indicate that the seller possessed the rights purportedly being sold. Normally, the seller would be known in the industry. In December of 1980 petitioner attended a seminar relating to leasing master recordings through UM. The seminar was conducted by Edwin Sr. for Monetary Planning & Management ("MPM") of which he was president *307 and sole owner. Edwin Sr. had discussed this program with petitioner outside of the seminar. Also present at the seminar were Medina and Peter Bennett, special consultant to UM. MPM received a commission on the first two lease payments made by any UM lessee. MPM received in excess of $100,000 in commissions related to the 1980 UM leasing program. In 1980 MPM also handled a program for Beaux Arts Editions, Ltd., Inc., an affiliated corporation of UM dealing in lithograph sales. On March 2, 1981, MPM was designated as the national marketing organization for UM and Beaux Arts Editions, Ltd., Inc. At the seminar participants were given a packet of materials relating to the lease program through UM. These materials included a brief synopsis of the program and a description of the tax benefits which could be derived from participation. Five categories of master recordings were listed as available for lease. The categories were determined on the basis of the "cost" of the lease of the master recording ranging from $230,000 to $1,500,000. Also included was an illustration of the tax consequences of participation. One illustration showed "Total Potential Federal Tax Savings 1980" *308 of $26,289 or $28,423 on an investment of $12,500, and an explanation of the requirement of "Profit Motive" for Federal income tax purposes. The materials explained that the expectation of profit need not be reasonable. No information was provided as to the profit potential for participation. Other materials enclosed in the packet were information on how to establish and operate a business and copies of various Federal and state tax forms which should be filed, including a Form 1045, Application for Tentative Refund, and a Form 1139, Corporation Application for Tentative Refund. A copy of a legal opinion letter drafted by "Bishop & Hill" was also enclosed. The opinion letter assumed that each lessee had the requisite "profit-making" intent. Finally, enclosed was a copy of a letter dated November 6, 1980, promising that UM would defend one case should the Internal Revenue Service challenge the projected tax benefits. Mack Gilchrist ("Gilchrist"), who later became associated with petitioner, also attended the seminar. A tax projection was prepared for Gilchrist showing that participation in the UM program would result in "Net Dollar Savings" of $21,700. Gilchrist was a high *309 school teacher. Gilchrist was not familiar with the master recording business and did nothing to investigate the business other than talking to Edwin Sr., Edwin H. Balder ("Edwin Jr.") and J. Rance Smith ("Smith"). Smith had recommended the UM leasing program to Gilchrist. Smith was employed as an insurance salesman and had been previously employed as a teacher and coach. Gilchrist did not believe that Smith had any experience in the music or entertainment industry. In fact Smith's experience was limited to "plays and dramatic acts, and working with kids, as a school teacher," singing around a campfire and producing "a lot of fight songs for the team." Smith had learned about the UM leasing program through Edwin Sr. Subsequently, he read materials relating to the program provided by UM and MPM and discussed the program with Jim Smith, an attorney, Terrell Rogers, a certified public accountant, and members of the firm of Gerald Kramer, Ltd. Smith received a finder's fee from MPM for referring Gilchrist and others to the UM leasing program. A document nominated as a "General Partnership Agreement" and dated December 17, 1980, was executed by Gilchrist for JAM. The agreement *310 showed that Gilchrist had an 80 percent ownership interest in JAM and had made a contribution of $14,800. No other partners signed this agreement nor were any other ownership interests or contributions reflected. However, a second, substantially identical agreement was executed by Gilchrist, Nancy L. McBride and Edwin Sr., the latter two as partners of Dos Amici, a partnership. The second agreement showed that Gilchrist, Dos Amici and petitioner had ownership interests of 80 percent, 10 percent and 10 percent, respectively, and had made contributions of $14,800, $1,850 and $1,850, respectively. The principal place of business of JAM was listed as "1622 East de Caballos, Tempe, AZ 85284" on both agreements, and the purpose of the partnership was listed as leasing, manufacturing, producing and distributing master recordings in both agreements. The partnership address was Gilchrist's home address. Petitioner did not know Gilchrist at the time JAM was formed. Edwin Sr. had arranged for petitioner's acquisition of an interest in JAM. Petitioner did not do any independent investigation but relied on Edwin Sr. and the information supplied at the seminar when investing in JAM. Gilchrist *311 executed an "Agreement of Lease" of a master recording on behalf of JAM effective December 17, 1980. The agreement provided that the property leased was "described in Schedule 1 attached hereto." However, on December 17, 1980, no master recording had been selected for lease although it was clear that the master recording selected would be one from those available in the $430,000 cost category. The term of the lease was 85 months from the date of delivery of the master recording. The rental payments due from JAM were $18,400 for the first 12 months of the lease, payable at the inception of the lease, and $4,600 for the thirteenth through the fifteenth months payable at the end of the eighth month of the lease term. From the sixteenth month through the expiration of the lease term, rent of $1,533.33 plus any arrearages was payable at the end of the month. The rental payments were limited to 70 percent of net receipts for the month. Net receipts were defined as gross receipts less returns, allowances and artist's royalties. Artist's royalties were listed as ".02 cents per cut." Statutory, mechanical royalties payable for rerecording the music were listed as ".02 3/4 per selection. *312 " In addition to these payments the lessee was required to make payments equal to 20 percent of net receipts up to $25,000 per month for exploitation of the master recording. On default of any required payments, the lessor's only remedy was repossession of the master recording. The lease also provided that the lessor would execute a consent to pass the investment tax credit through to the lessee. Further, the lease provided that the lessee would apply for registration of a claim of copyright with respect to the master recording. Finally, the lease provided that the master recording could be substituted if there were a material defect in it. The lease did not purport to give the lessee exclusive rights to manufacture, produce or distribute the selections on the master recording. Gilchrist submitted payment to UM in the amount of $14,800 on December 17, 1980. On December 30, 1980, petitioner submitted payment to UM in the amount of $1,850. By check dated January 2, 1981, petitioner received $555 from MPM. This amount represented the commissions paid to MPM by UM on petitioner's investment. Dos Amici also submitted a lease payment to UM in the amount of $1,850. Edwin Sr. received *313 a commission on this lease payment. Before choosing a master recording Gilchrist and Edwin Sr. consulted with Edwin Jr. Edwin Jr. recommended Joni Mitchell as a popular artist who consistently had album sales in excess of 300,000 copies. Petitioner, Gilchrist and Edwin Sr. also read music industry publications which confirmed that Joni Mitchell was a popular recording artist. A Joni Mitchell master recording "Conversations" was selected. None of the JAM partners listened to the Joni Mitchell master recording prior to selection. UM did send the master recording to Edwin Sr. after selection, and he and Gilchrist listened to the recording on January 26, 1981. Gilchrist accepted the master recording for JAM. Neither Gilchrist or Edwin Sr. believed the master recording to be of poor technical quality although Edwin Sr. was aware of surface sound noises. By agreement dated March 5, 1981, JAM entered into an employment contract with United Distribution, Ltd. ("UDL") for production, distribution and promotion of records and tapes of the Joni Mitchell master recording. The agreement was nonexclusive and was to commence on March 5, 1981, and terminate on June 30, 1984, or earlier *314 on ten days written notice. On execution of the agreement UDL received $3,500 to produce 750 to 1,000 test records. UDL suggested other distributors for national distribution. UDL was authorized to distribute up to 500 promotional copies. UDL was to pay JAM 80 percent of the sales price less production costs for records or tapes sold and not returned within 30 days. UDL was to account to JAM biannually. The agreement also provided that UDL was to pay expenses as directed by JAM. The agreement was signed on behalf of JAM by Gilchrist. UDL was established in 1980 and owned by Edwin Jr. Edwin Jr.'s experience in the music industry was limited to working as a musician and as a salesman in a stereo or record store. Leon Ross ("Ross") was employed by UDL. Ross had no prior experience in the record distribution industry. Petitioner and Gilchrist did not adequately investigate the extent of Edwin Jr.'s and Ross's experience in the music industry. The decision to employ UDL was made by petitioner and Gilchrist. Edwin Sr., Edwin Jr.'s father, did not participate in the decision because of potential conflict. Edwin Jr. was a salesman for the UM leasing program. There was negligible *315 partnership business activity in 1980 and 1981. The partnership reported no income for either of these years. Gilchrist, who had assumed responsibility for any business activities of the partnership, established and maintained a checking account in the name of the partnership, signed any documents necessary for the partnership, kept partnership records and ordered stationery and business cards for JAM. These activities, were in part, suggested at a seminar conducted by Edwin Sr. in 1981. UDL did not produce any records from the master recording during 1981 although it did create a production album cover, contact a record producer and have a stamper manufactured from which records could be produced. In addition UDL contacted local businesses on behalf of JAM and other UM lessees to arrange for distribution of records in generic covers. On November 12, 1981, Gilchrist notified UDL that the distribution agreement was to be terminated within 10 days and requested the return of any materials in the custody of UDL. JAM did not locate another distributor until July of 1982 when Edwin Sr. contacted Ross, formerly of UDL, who was conducting business through Heritage Sound Recording *316 Distributors ("Heritage"). Edwin Sr. scheduled an appointment with Ross and informed the other partners of JAM of this appointment stating that "such meeting would be most important and beneficial to business and tax structures." A meeting was held on July 29, 1982. As a result of the meeting, Gilchrist signed a contract with Heritage dated August 14, 1982, on behalf of JAM which provided for the pressing of 100 records at a cost of $476.00. In the contract JAM warranted that it had the exclusive right to manufacture and distribute the record and its contents. On November 17, 1982, Heritage made a presentation for the partners of JAM and other UM leasing program investors in which a group advertising campaign was outlined. This meeting was summarized in a memorandum from Edwin Sr. which concluded "REMEMBER! THE I.R.S. IS WATCHING!!" JAM paid a rateable portion of the cost of a newspaper advertisement, and the advertisement was run in December of 1982. No other newspaper advertising was done for JAM. Heritage produced a total of 109 records for sale by JAM. These record albums were offered for sale in a blank jacket with a label affixed to the record listing song titles. An *317 album in a blank jacket could not be sold in the normal retail market. Moreover, because of the poor quality of the records produced, they were unacceptable as commercial recordings. The label which was affixed to the record incorrectly listed the selections on the record. Of the total records produced for sale, nine were sold and seven albums were given to radio stations and newspapers for promotion. Approximately ten additional test albums were distributed to the media. On July 28, 1983, the Federal Bureau of Investigation contacted Ross and issued a verbal cease and desist order to him relating to the manufacture and sale of the JAM album "Conversations." The cease and desist order was based on a complaint by Siquomb Publishing Corporation, the owner of the musical composition rights. Both before and after the cease and desist order Ross had attempted to get information from UM to permit copyright of the record and mechanical licensing. This information was never produced, and Heritage ceased production and distribution activities after July 28, 1983. From that date to the date of trial, no further production or distribution activities were attempted with respect to the *318 "Conversations" master recording. Neither Banyan nor UM had any contractual right to Joni Mitchell's performance. [5] Joni Mitchell was under exclusive contract with Warner Bros./Seven Arts, Records, Inc., Asylum Records, Elektra/Asylum Records and The David Geffen Company from December 1, 1967, through the date of trial. Although a waiver of the exclusive right to Joni Mitchell's services could have been granted, no waiver was granted by the companies to whom she was under contract. Information relating to the ownership of the rights to Joni Mitchell's performance and the rights to the use of the musical compositions on "Conversations" was readily available to the public. [6] A publication, "Phonologue", available in retail music stores provides a cross index of information relating to artists, record companies, songs and album names. The Recording Industry Association of America, *319 a trade association, also provides information to the public. Other sources of information would be the U.S. Copyright Office and one of the organizations which protect music songwriters and publishers. Information would also be available by visiting a local record store and locating albums currently available by the artist. Joni Mitchell's album "Ladies of the Canyon" which contains all of the selections available on "Conversations" was still being sold in retail stores in 1983. *320 By August of 1983 the Internal Revenue Service had contacted lessees of the UM leasing program and requested that they complete a questionnaire relating to their investments. Edwin Sr. through MPM advised lessees, including the JAM partners, on the proper procedure for dealing with the Internal Revenue Service. On August 20, 1983, Edwin Sr. conducted a seminar in which he reviewed the materials presented to those individuals who invested in the UM leasing program. In addition he reviewed responses which could be used to answer the Internal Revenue Service questionnaire. A notice of deficiency was issued to petitioners on March 19, 1984. In the notice of deficiency respondent made the following explanation of items for 1977. We have disallowed the investment credit you claimed because you did not establish that you are entitled to this credit. Shown on return as previously adjusted
$668.00
Corrected Amount
$ 0.00
Because this credit was fully disallowed in the year of investment, your carry-back to this tax year has been fully disallowed. There was a similar explanation for 1978, varying only as to the amount shown on the return. In 1980 the following *321 explanation of items was made: It is determined that the ($1,850.00) and $     claimed on your returns filed for the years 1980 and     respectively, as being your distributive share of a partnership loss incurred by "JAM Productions" are not allowable because it has not been established that you owned any interest nor had any basis in this alleged partnership, nor that the alleged partnership, if formed, engaged in any business or profit motive transactions during the years at issue. It has likewise not been established that, if the alleged partnership was formed and engaged in any business or profit motive transactions, said partnership incurred any expenses or losses during the years at issue. Accordingly, your taxable income is increased $1,850.00 and $     for the 1980 and     years, respectively. It is determined that the $4,300 claimed on your return filed for the year 1980 as being your distributive share of the investment credit from "JAM Productions" is not allowable because it has not been established that you owned any interest nor had any basis in the alleged partnership, nor that the alleged partnership, if formed, engaged in any business or profit motive *322 transactions during the year at issue. It has likewise not been established that, if the alleged partnership was formed and engaged in any business or profit motive transactions, said partnership acquired any "Section 38 property", as defined in Internal Revenue Code of 1954, Section 48 during the year at issue. Accordingly, your income tax is increased $2,439 for the 1980 taxable year. Petitioners did not receive the page explaining the adjustment relating to partnership losses of JAM. However, the complete notice of deficiency was served on petitioners with respondent's answer on August 8, 1984. In their petition petitioners claimed that respondent's determinations were in error and asserted, in part, that the value of the master recording was at least $430,000. Respondent denied this assertion in his answer. OPINION The sole issues before the Court are whether petitioners are entitled to an allocable share of partnership loss and investment credit attributable to JAM. The partnership loss is the result of rental deductions claimed by JAM in the amount of $18,500 and the investment credit is the result of a pass through of benefits attributable *323 to the purported lease of a master recording by JAM. Respondent denied the loss and investment credit on a variety of grounds. [7] We find that JAM did not engage in any activity with the objective of making a profit and decline to consider respondent's other arguments. *324 In order to claim the rental expense and investment credit JAM must satisfy the requirements of section 162(a) or 212(1) or (2) and section 38, respectively. These provisions require that the activity be engaged in with an actual and honest objective of making a profit. Capek v. Commissioner,86 T.C. 14, 36 (1986); Flowers v. Commissioner,80 T.C. 914, 931 (1983). A reasonable expectation of profit is not required, but the taxpayer's profit objective must be bona fide. Surloff v. Commissioner,81 T.C. 210, 233 (1983); Fox v. Commissioner,80 T.C. 972, 1006 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. without published opinion sub nom. Hook v. Commissioner,Kratsa v. Commissioner,Leffel v. Commissioner,Rosenblatt v. Commissioner,Zemel v. Commissioner,734 F.2d 5-7, 9 (3d Cir. 1984), affd. sub nom. Barnard v. Commissioner,731 F.2d 230 (4th Cir. 1984). "Profit" means economic profit without consideration of tax savings. *325 Capek v. Commissioner,supra at 36; Surloff v. Commissioner,supra at 233. If the activity is not engaged in with the requisite objective of making a profit, the deductions are only allowable to the extent that gross income derived from the activity exceeds deductions allowable irrespective of whether the activity is engaged in for profit. Sec. 183(b)(2). Where the activities are conducted by a partnership, the profit objective must be present at the partnership level. Fox v. Commissioner,supra at 1006; Brannen v. Commissioner,78 T.C. 471, 505 (1982), affd. 722 F.2d 695 (11th Cir. 1984). However, since a partnership is merely a formal entity, a determination of profit objective can be made by reference to the activities of the individuals who manage the partnership. Rosenfeld v. Commissioner,82 T.C. 105, 112-113 (1984); Fox v. Commissioner,supra at 1007-1008. These individuals need not be partners. Fox v. Commissioner,supra at 1008. When the partnership is passive in its operations, the prudence it exercises in acquiring *326 property and assigning duties to third parties and the care with which it oversees the performance of such duties are of heightened importance. Flowers v. Commissioner,supra at 932. The issue of whether the partnership has the requisite profit objective is one of fact which is to be resolved by examination of the surrounding facts and circumstances. Capek v. Commissioner,supra at 37; Hager v. Commissioner,76 T.C. 759, 784 (1981). In making this determination, the Court will give greater weight to objective facts than mere statements of intent. Surloff v. Commissioner,supra at 233. The burden of proof is on petitioners to show the existence of a profit objective. Rule 142 (a). Here, Gilchrist was purportedly the managing partner of JAM. However, Gilchrist and the other partners relied on the advice of Smith, Edwin Sr., Edwin Jr. and Ross. As these parties were active in the management of JAM, their actions are significant in making a determination as to whether there was the requisite profit objective *327 at the partnership level. Initially, we note that Smith, Edwin Sr. and Edwin Jr. all benefitted from the lease of the master recording from UM irrespective of the success of the venture. All three received finder's fees or commissions on the initial lease payments made by participants in the program. In fact MPM, of which Edwin Sr. was the sole owner, received in excess of $100,000 from the 1980 UM leasing program. MPM also marketed programs for an affiliate of UM and became the national marketing organization for UM and the affiliate. Edwin Jr. received $3,500 from JAM. None of the parties involved in the management of JAM had a significant degree of experience in the music industry. Gilchrist conceded that he had no knowledge of the music industry. Smith, his business advisor, was similarly lacking in expertise. There is no evidence in the record that Edwin Sr. had any experience in the music industry. Edwin Jr., who was purportedly knowledgeable in the music industry, had been a musician and a salesman in a stereo or record store. Ross's first experience in the record distribution industry was at the time of his employment by UDL. Petitioner and the other partners made *328 no attempt to investigate the qualifications of these advisors and, in some cases, were aware that these advisors had no expertise in the music industry. Despite his lack of expertise Gilchrist was authorized to listen to and accept the master recording on behalf of the partnership. At the time the master recording was leased none of the partners of JAM or their advisors attempted to ascertain whether UM, their lessor, had the rights which were subject to the lease. This information could have been ascertained by visiting a local record store. "Ladies of the Canyon" which contains all of the selections listed on "Conversations", the master recording leased by JAM, was available in retail record stores. In addition "Phonologue" which provides a cross index of information relating to artists, record companies, songs and album names could have been consulted. Certainly the lease provision requiring the lessee to apply for registration of a claim of copyright with respect to the master recording should have alerted the partners of JAM and their advisors that further investigation should be conducted before entering into the lease agreement with respect to a designated master recording. *329 In fact, the JAM partners appeared to be oblivious even to the rights purportedly transferred to them under the lease agreement with UM. Although the lease agreement was nonexclusive, JAM warranted to Heritage that it had exclusive rights. The record clearly indicates that tax benefits as opposed to economic profit were the inducement for investment in the UM leasing program. The materials distributed at the seminar presented by MPM in December of 1980 indicated only that investors in the UM leasing program could enjoy significant tax savings in excess of the amount of cash actually invested by utilizing the investment credit provisions. No information was provided as to anticipated economic profit from investment in the program. The materials did explain that an investor need not have a reasonable expectation of profit, suggesting that investors could ignore the economic aspects of their investment. Edwin Sr. assisted investors, including the JAM partners, in establishing and maintaining a business facade which he hoped would avoid Internal Revenue Service scrutiny. Edwin Sr. conducted seminars to explain what procedures should be followed to create the appearance of an operating *330 business. When the UDL agreement was terminated, JAM did not enter into another distribution or production agreement for approximately nine months. Edwin Sr. urged that an agreement be executed to protect the tax structure. After an agreement had been reached with Heritage, Edwin Sr. suggested that UM leasing program investors participate in a group advertising campaign cautioning "REMEMBER! THE I.R.S. IS WATCHING!!" On this record the only conclusion which we can make is that JAM leased a master recording solely for the purpose of providing tax benefits to its partners and commission income and finders' fees to Edwin Sr., Edwin Jr. and Smith. The transactions were highly unusual in the music industry, and JAM through its partners and advisors failed to take any action which would ensure that the venture was a success. JAM, acting through its partners and advisors had no objective for profit, reasonable or otherwise. Consequently, the deductions claimed under sections 162(a) or 212(1) or (2) and the investment credit under section 38 were properly disallowed by respondent. JAM had no income from the activity in 1980 and cannot utilize section 183. Finally, we wish to caution *331 petitioners and others who are involved in similar tax avoidance or evasion schemes that the Court is authorized to award damages to the United States in an amount up to $5,000 when a proceeding is instituted or maintained primarily for delay or where petitioners' position therein is frivolous or groundless. Sec. 6673. In Elliott v. Commissioner,84 T.C. 227, 248 (1985), affd. 782 F.2d 1027 (3d Cir. 1985), we warned that "[a]t some point arguments in these highly leveraged tax avoidance (or evasion) schemes must be regarded as 'frivolous or groundless,' [under] section 6673". We reiterate that language here and note that damages were considered in Brown v. Commissioner,85 T.C. 968 (1985), and awarded in Oneal v. Commissioner,84 T.C. 1235 (1985). We will not hesitate to award damages in appropriate circumstances. To reflect the foregoing, Decision will be entered for the respondent.
Footnotes
1. Unless otherwise specified, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue. All rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. Deborah L. Grace was not involved in any of the transactions at issue except by virtue of her community property interest, if any. Therefore, unless otherwise specified, petitioner shall refer only to Raymond E. Grace. ↩
3. Petitioners have conceded their liability for self-employment taxes for 1980 under sec. 1401. Rule 34(b)(4). Petitioners' medical expense deduction for 1980 under sec. 213 will be determined arithmetically in accordance with our determination as to the deductibility of losses attributable to petitioner's investment in JAM Productions.↩
4. Millman consented to an entry of Final Judgment of Permanent Injunction under sec. 7408 relating to the organization and sale of interests in another tax shelter.↩
5. Petitioners argue that under the Uniform Commercial Code a buyer may acquire greater rights than the seller had. While this statement is generally true, application to copyrighted material would abrogate the purpose of copyright protection. 1 Nimmer, Nimmer on Copyright, sec. 1.03[A]↩ (1985).
6. In fact, Robert Scherl, one of Banyan's appraisers, was requested to research the ownership of rights to certain recordings. As to the Joni Mitchell master recording sold by Banyan as "Conversations" he concluded: This album originally released as "Ladies of the Canyon" * * *. This the exact configuration of original issue. Mitchell has always been a WBA artist, first on Reprise, now on Asylum. No evidence of WBA ever licensing any of her product elsewhere. Petitioners' counsel objected to the introduction of this document on the basis that the document was undated and that the author of the document was not available at the trial of the case. We will sustain counsel's objection to the extent that we will not consider the document to prove the truth of the matters therein nor to prove that the information contained therein was available to Banyan, UM or any of the leasing program investors during 1980. However, we will consider this document to the extent that it indicates that information relating to ownership of the right to Joni Mitchell's performance could be obtained through investigation.↩
7. In the notice of deficiency respondent stated, in part, that the absence of "any business or profit motive transaction" precluded the loss and credit claimed by petitioners as a result of petitioner's investment in JAM. In his brief respondent claimed that the partnership transactions were a sham. The record does not disclose that petitioners were informed of this theory until respondent submitted his pre-trial memorandum shortly before the trial of this case. Petitioners assert that they were surprised and prejudiced by respondent's belated assertion that the transactions were a sham. We have declined to consider a theory or issue raised by respondent when the Court determines there has been surprise and substantial disadvantage to petitioners in the presentation of their case because of the manner in which the notice of deficiency and pleadings were drawn compared to the issues raised at trial. Estate of Horvath v. Commissioner,59 T.C. 551, 555 (1973). The Court will find surprise and substantial disadvantage where the evidence required to be presented on the issue or theory not pled is different than the evidence which would be presented in support of the issues or theories pled. Estate of Horvath v. Commissioner,supra at 556. As articulated in a recent opinion of the Court of Appeals for the Fourth Circuit, there is a two pronged test for determining whether a transaction is a sham. Rice's Toyota World, Inc. v. Commissioner,752 F.2d 89, 91-92 (4th Cir. 1985), affd. on this issue 81 T.C. 184 (1983). The first prong of this test is subjective and requires a determination of whether the taxpayer had a business purpose for entering into the transaction. Rice's Toyota World, Inc. v. Commissioner,supra at 92. The second prong of the test is objective and requires a determination of whether there was a reasonable possibility of economic profit apart from the tax benefits. Rice's Toyota World, Inc. v. Commissioner,supra at 94. The consequence of a finding of sham is that the transaction will be recharacterized according to its substance. Rice's Toyota World, Inc. v. Commissioner,supra at 95. Here, the notice of deficiency only encompassed the subjective aspect of the lease transaction. It did not encompass the objective aspect of the lease transaction. Therefore, although the notice of deficiency is sufficient to notify petitioners that respondent would base his denial of loss and investment credit on failure to satisfy the profit objective requirement under secs. 162(a) or 212(1) or (2) and 38, it is not sufficient to notify petitioners that respondent would raise the theory that the transaction was a sham. While the elements of proof relating to both theories may be identical, in substantial part, we believe that the focus of counsel's preparation may have been different had the sham theory been raised earlier. Under the facts of this case we cannot determine or say that respondent's belated claim of sham did not result in surprise or disadvantage to petitioners. Consequently, in the absence of any evidence that petitioners were informed of the sham transaction theory prior to the date respondent submitted his pre-trial memorandum, we conclude that the sham theory was not timely raised. We note that we reach this result "in an abundance of caution" and, on the basis of this record, would have sustained respondent's argument that the transactions were a sham if that issue was properly before us. In this respect it is significant that Sye Mitchell, one of the appraisers employed by Banyan, appeared at the trial of this case and claimed his Fifth Amendment privilege to each question posited except his current occupation and home address in December of 1980. Respondent did properly raise the issue of profit objective, and our determination in this case is based on that theory. Petitioners also claim that respondent did not properly raise issues or theories with respect to whether JAM had valid title to the master recording, the fair market value of the master recording, whether JAM leased sec. 38 property and the date the master recording was placed in service. We find that each of these factors could be elements of proof of the issues clearly stated in the notice of deficiency and will not decline consideration of these factors within the context of our analysis of JAM's profit objective. In addition we note that the fair market value of the master recording was delineated as an issue through the pleadings. Finally, in the alternative, petitioners seek to raise an issue as to a theft loss resulting from the transactions. If such a loss occurred it seems that it would be in a year not before this Court. We have no jurisdiction to make such a redetermination. Commissioner v. Gooch Milling & Elevator Co.,320 U.S. 418↩ (1943). In addition petitioners did not timely raise this issue. We will not permit petitioners to raise new issues while strenuously arguing that respondent should not be permitted to raise new issues. "What is sauce for the goose is sauce for the gander."