HARRY R. SECOY and MARY V. SECOY, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Secoy v. Commissioner
Docket Nos. 5280-85, 7443-85, 7825-85, 13512-85, 13513-85.
United States Tax Court
T.C. Memo 1987-286; 1987 Tax Ct. Memo LEXIS 286; 53 T.C.M. (CCH) 1050; T.C.M. (RIA) 87286; June 9, 1987. Laura Lee, for the petitioners. Henry Thomas Schafter, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined deficiencies and additions to tax as follows: Additions to Tax
Tax
Section
Section
Year
Deficiencies
6653(a)(1) [2]
6659
Secoy, Docket No. 5280-85
1980
$25,010
$1,251
$2,561
1981
40,074 * 2,004
11,815
1982
44,444 * 2,222
13,333
Saty, Docket No. 7443-85
1978
$ 1,097
$ 55
$ 329
1979
2,961
148
888
1980
407
20
1981
9,261 * 463
2,778
1982
4,736 * 237
1,421
Low, Docket No. 7825-85
1981
$ 5,580 * $ 279
$1,572
1982
5,048 * 252
1,514
Weldon, Docket No. 13512-85
1980
$ 811
1981
23,412
$4,069
1982
15,031
3,977
Weldon, Docket No. 13513-85
1979
$ 3,551
$1,065
*289 In amendments to the answers, respondent alleged that petitioners are liable for interest on the underpayments of tax calculated at the higher rate provided in section 6621(c) [formerly section 6621(d)]. [3]
The issues for decision are (1) whether petitioners are entitled to deductions and credits with respect to certain master sound recordings; (2) whether petitioners are entitled to a theft loss deduction for out-of-pocket payments made with respect to master sound recordings; (3) whether petitioners are liable for additions to tax under section 6659 because of underpayments of tax attributable to valuation overstatements with respect to the *290 master sound recordings; and (4) whether petitioners are liable for the increased rate of interest provided in section 6621(c) because the underpayments are attributable to tax-motivated transactions. FINDINGS OF FACT All of petitioners were residents of the State of Washington at the time their respective petitions in the above cases were filed. They filed Federal income tax returns for each of the years in issue. In addition, petitioner Ronald A. Weldon filed a Form 1045, Application for Tentative Refund, seeking to carry back certain items from 1982 to 1979, 1980, and 1981. At all times material hereto, petitioner Harry R. Secoy (Secoy) was in the private practice of ophthalmology; petitioner Ronald A. Weldon (Weldon) was employed by the Snohomish County, Washington, Public Utilities Department, as a journeyman lineman, safety supervisor, or security administrator; and petitioner Patrick M. Low (Low) was employed by the Xerox Corporation as a technical supervisor, dealing with new employees and account problems. Low and petitioner Patrick E. Saty (Saty), along with Douglas Mumaw, were partners in a partnership known as Ridgewood Associates. Ridgewood Associates was formed *291 at the suggestion of Percy E. "Ted" Goodwin (Goodwin), Low's father-in-law, and Clifford M. Johnston (C. Johnston) in about October 1981. Weldon was a 2/35 limited partner in a partnership known as Emerald Isle, Ltd. (Emerald Isle), in which the general partners were Richard A. Watts (Watts) and Frederick A. Johnston (F. Johnston). [4]
Secoy, Emerald Isle, and Ridgewood Associates purportedly acquired master recordings [5] in issue here from Jerden Industries, Inc. (Jerden), a Washington corporation headed by Gerald B. Dennon (Dennon). Petitioners entered into transactions with Jerden through C. Johnston and Goodwin, sales agents for World Decca, the "marketing arm" for Jerden. F. Johnston, brother of C. Johnston, moved to Seattle in 1981 to act as a sales agent for Jerden, specializing in forming and selling limited partnership interests. The master recordings purportedly acquired *292 by petitioners or their partnerships were as follows: Petitioner
Date
Title
Stated Price
Secoy
6-25-81
Toots Thielemans
$452,000 Low and
Saty/Ridgewood
Associates
10-26-81
Johnny Horton
533,000
Weldon/Emerald
Isle
6-1-82
Buddy Rich
533,000
Diana Honey
533,000
Hi-Fi
533,000
Mark Winkler
533,000
Lonesome City Kings
533,000
Ian Matthews
533,000
Secoy chose the master Toots Thielemans; he had seen Thielemans perform in person and on television. The master purportedly acquired by Ridgewood Associates was selected by Goodwin or Dennon, but Low had general knowledge of the artist, Johnny Horton. The masters purportedly acquired by Emerald Isle were selected by Watts and F. Johnston. Petitioners each received various promotional materials from Goodwin or C. Johnston, although not all petitioners received all of the materials used in promoting Jerden investments. Certain documents, such as appraisals and an opinion letter written by attorney David C. Mitchell of Everett, Washington, were received, if at all, only after petitioners had entered into the transactions in issue. The master recordings offered by *293 Jerden sold for only four prices: $351,000, $452,000, $533,000, and $702,000. The purchase price was to be paid with a small down payment payable in cash or in cash and a short-term recourse promissory note. The balance of the purchase price was payable by a long-term recourse promissory note with installments payable from sales of records. The promotional materials represented that an advance loan commitment would be made available by a bank to refinance the long-term recourse note at its maturity. Prior to the transactions in issue, petitioners had participated in master recording tax shelters in which a portion of the consideration purportedly paid for a master recording was represented by nonrecourse promissory notes. Prior to Secoy's transaction here in issue, the Internal Revenue Service (IRS) had commenced an audit of Secoy's tax returns with respect to his earlier master recording transactions, and he was aware of the position of the IRS with respect to fair market value of master recordings and the use of nonrecourse financing generally, as well as Jerden transactions in particular. Low was also aware at the time of the Ridgewood Associates transaction in issue that *294 recourse financing had a tax advantage over nonrecourse financing. Low knew of no nontax reason to use recourse financing instead of nonrecourse financing in master recording transactions. The promotional materials emphasized the tax benefits of purchasing a master recording rather than any economic benefits that could be expected. Examples and projections demonstrating the large ratio of the tax benefits available to the cost of a master recording were set forth in tabular form. The promotional materials included no projections of sales or income to be derived from a master recording, but included a 25 page tax opinion by Joseph Wetzel, a Portland, Oregon, attorney. Wetzel had reviewed and revised various master recording documents, sales agency agreements, and loan commitment documents discussed below. Wetzel had no experience in the music recording business. The Jerden promotional materials contained a section entitled "Tax Risks" containing the following language: The seller expects the purchaser to purchase the master for a bona fide business operation and with the intent of the purchaser to make a profit. Nonetheless, there are substantial tax risks associated with *295 the purchase of master sound recordings. These risks include, but are not limited to, the possibility that (1) the purchaser will be classified as an associate of a corporation, or as a partner of a partnership, in which event virtually all of the anticipated tax benefits expected to be derived from a purchase of a master sound recording would be unavailable, (2) the Internal Revenue Service (the "Service") may contest the deductibility of certain items, or the tax period in which such items are deductible, anticipated to be claimed as deductions by the purchasers, including the major portion of the depreciation expense and investment tax credit, and (3) a purchaser may be required to recognize taxable income, possibly at unearned income rates at up to 70 percent on income derived from operations, or from the sale or foreclosure of his master sound recording. * * * There is substantial risk of audit of the purchaser's tax return by the Internal Revenue Service if losses are experienced. In the event that a purchaser's return is audited there is substantial risk that the Service may disallow all or a part of the losses or credits claimed by the purchaser from participation in this *296 offering. The Service may base its attack on any one or more of the grounds outlined below or other grounds: 1. Challenge to Purchase Price. * * * 2. Earned Income Challenge. * * * 3. Disallowance of Certain Methods of Depreciation. * * * 4. Recharacterization of Relationship with Distributor. * * * 5. Disallowance of Investment Tax Credit. * * * 6. Challenge of Profit Motive. * * * 7. Phantom Gain on Sale or Foreclosure of an Interest. * * * 8. The Revenue Act of 1978 provides a revised "at risk" rule which would apply to investments (direct and indirect) in all activities except real estate. The amendments made to the at risk rule generally apply to taxable years beginning after December 31, 1978. Accordingly, Purchasers (other than corporations which are not electing small business corporations) will be subject to the "at risk" provisions of sec. 465 and losses in excess of their amounts at risk will not be allowed. 9. Legal Expense. * * * 10. Cash Flow Shortage. * * * Neither the Seller nor the offeror or any advisor or representative of the foregoing assumes any responsibility for the tax consequences *297 of this transaction to any Purchaser. Potential Purchasers should be aware that changes in the Internal Revenue Code, or regulations or interpretations thereof, by Congress, the Internal Revenue Service or the courts may reduce or eliminate anticipated advantageous tax consequences to the Purchaser. Even if tax advantages are available, their utility to the Purchaser will depend upon his personal tax position for the year of purchase and subsequent years. It should also be noted that, under certain circumstances, purchase of a Master Sound Recording could result in a net tax disadvantage. The Purchaser should consult his own tax implications of this placement and of ownership of an interest to him. * * * Each Purchaser must consult with his tax counsel to analyze the risks involved in this Offering, for federal, state and local taxes. Weldon discussed the Jerden transaction with his accountant, Gilbert Hain. Otherwise none of petitioners consulted tax experts in relation to their transactions with Jerden. They did not seek independent appraisals of the master recordings or seek the advice of anyone with experience in the music or record industry as to the merits of purchasing *298 a master recording. They relied solely on the salespersons promoting Jerden with respect to all aspects of the transactions. In relation to their respective transactions, each of the petitioners or his partnership delivered to Jerden the following: Name
Cash
1-Year Note
10-Year Note
Secoy
$10,500
$10,500 $431,000
Low/Ridgewood
Associates
13,000
13,000
507,000
Weldon/Emerald
Isle
78,000
78,000
3,042,000
The above amounts shown for Weldon/Emerald Isle reflect the total consideration purportedly paid for six master recordings; the documentation of the transactions is internally inconsistent, with transaction dates ranging from June 1, 1982, to September 21, 1982. Under the terms of the long-term notes, payments during the first 3 years were to be made solely out of 50 percent of net income from the master recordings. Beginning on the third anniversary of the note, minimal annual payments were required. Petitioners or their partnerships executed purchase agreements with Jerden providing as follows: WHEREAS, [Jerden] owns all rights including all rights in and to the respective artists' contracts hereinafter conveyed to Purchaser *299 * * * free and clear of all liens and encumbrances, in and to certain master sound recordings * * * to be used in the manufacture of phonograph record albums and prerecorded tapes * * * for all purposes whatsoever and in perpetuity throughout the whole world; and * * * NOW, THEREFORE, the parties hereto agree as follows: 1. Sale of the Master Sound Recordings. [Jerden] hereby sells, grants, bargains * * * and forever conveys to the Purchaser * * * all of [Jerden's] right, title, privilege, interest, ownership, and claims of any kind and character whatsoever which it now has * * * in the master sound recording. This sale includes without limitation the following rights: (a) The master sound recording and wherever and whenever permitted, the exclusive right to secure copyright registration of the "Sound Recordings" in Purchaser's own name and the right to renew such copyrights * * * with respect to the Master Sound Recording. * * * 2. Seller's Warranties and Representations. [Jerden] hereby warrants, represents, and covenants with respect to each master sound recording and each album as follows: * * * (b) [Jerden] has the sole, full and exclusive right, *300 title, and interest in and to the master sound recording and the unrestricted power to enter into and perform this Agreement. Petitioners also executed security agreements by which they granted Jerden security interests in the respective master recordings. Petitioners also received bills of sale purporting to transfer title to the master recordings. Jerden, however, had at most licenses and did not have clear title to any of the master recordings purportedly conveyed. Simultaneous with the execution of the purchase agreements, petitioners or their partnerships entered into sales agency agreements with First American Records, Inc. (First American). Under these agreements First American agreed to market records produced from petitioners' or their partnerships' master recordings. Petitioners or their partnerships were required to provide the funds necessary for the production of the first 1,000 records; thereafter, First American would advance these costs on behalf of petitioners or their partnerships. First American also agreed to guarantee sales of 2,000 albums per year during the second through the eighth year of the sales agency agreement, regardless of actual sales. Guaranteed *301 sales, such as contemplated by the First American agreements, are not common features of distribution agreements in the record industry. According to the promotional materials, these "guaranteed" sales would generate sufficient income to enable petitioners or their partnerships to pay the debt service on the long-term Jerden notes. As compensation for its efforts, First American was to receive 50 percent of total net revenues from the sale of records produced from petitioners' or their partnerships' master recordings. Dennon was active in the music business in the 1950's and the 1960's. His return to the record business was accurately described in a newspaper article dated March 31, 1982 (stipulated to by petitioners) as follows: Making a tough decision to return to the record business, he discovered it was a different world than he had left in the mid-'60s. CBS, Polygram, and W-E-A had all the money. The little guy just didn't have a chance. It was then Dennon discovered that heavyweight investors could be attracted to the record business through tax write-offs on the potential earnings of a tape master. "Here's how one of these shelters works," writes Jonathan Greenberg *302 in the April 27, 1981 issue of Forbes. "A promoter produces a number of master recordings of mediocre performers. A master is then resold to an investor as a tax shelter, at a hefty profit to the promoter. The investor pays a certain amount down, and is given a nonrecourse note to inflate the 'fair market value' of the record. With investment credit and depreciation on the leveraged value, the investor gets as much as four times his investment as a write-off on the deal. Nobody really cares what happens to the records. Chartbusters they aren't." "Frankly, I was appalled when I heard that people would make tapes, then put them in the closet," says Dennon. "But then I thought, 'Why not use this as a way to capitalize a legitimate record company?'" Why not indeed? For one thing, it has raised the question in the minds of many local performers, including some on the label, as to whether First American "really cares what happens to the records." Is the company a tax shelter or a record business? First American was a corporation organized under the laws of the State of Washington. Dennon owned all the stock of First American and served as a director and president at the *303 time petitioners or their partnerships entered into the transactions with Jerden and the sales agency agreements with First American. First American marketed records under several labels, First American, Music is Medicine, Piccadilly, The Great Northwest Music Company, Stoney Plain, Burdette, and Jazz Man. The First American record catalog consisted primarily of previously released material. For example, the Jazz Man series consisted mainly of re-releases of early recordings of several well known jazz musicians, which generated consistent if not spectacular sales. First American also provided local Seattle artists the opportunity to produce and distribute records made from master records of their music. As promised, on the date petitioners or their partnerships entered into their transactions with Jerden, they received an advance loan commitment from LaSalle Overseas Bank, Ltd. (LOB). The Jerden promotional materials provided that if the purchaser of a Jerden master recording paid the loan commitment fees, "LaSalle will refinance the debt for a further 10 years, stamp the Jerden note paid, and cancel the security agreement, at which time the master becomes the 'free and clear' *304 property of the purchaser." Under the loan commitment, LOB agreed to lend to petitioners or their partnerships an amount designed to be sufficient to repay the initial long-term note to Jerden plus accrued interest at maturity. In order to secure this advance loan commitment, petitioners or their partnerships agreed to pay to LOB an initial loan commitment fee of 1 percent of the committed loan amount, one-half of which was payable upon the execution of the loan commitment and one-half 1 year later. Thereafter petitioners or their partnerships were required to pay an annual loan commitment fee of one-half of 1 percent of the loan amount until the time the loan was funded. The LOB loan commitment agreement provided that payment of the annual loan commitment fee was a condition upon the continuing liability of LOB to refinance the Jerden note. LOB never sought nor secured financial statements from petitioners or other Jerden investors. The loan from LOB was to be unsecured. The terms of the LOB loan required that it was to be repaid in ten annual installments, the first of which was to be paid 1 year after the loan was funded. The first nine installments were to be equal to 1 percent *305 of the principal amount of the loan and to be applied first to accrued interest and then to principal. The remaining principal balance and accrued interest on the note was due on the tenth anniversary of the loan, i.e., 20 years after the original transaction. The LOB loan commitment also gave petitioners or their partnerships an unusual payment option. On the due date of the first installment, petitioners or their partnerships could choose to make that and all future installments in U.S. currency or the U.S. currency equivalent of a mix of two foreign currencies chosen by petitioners or their partnerships from lists supplied by LOB. If petitioners or their partnerships chose to tie installments to the mix of foreign currency, the exchange rates for the first and all future installments would be determined by the exchange rates on the date of the first installment. Petitioners or their partnerships could choose to tie the annual installments to different pairs of foreign currency during each year of the term of the loan. It was anticipated that petitioners or their partnerships would elect to use this "basket of currencies" payment option. As a result petitioners or their *306 partnerships would be able to make each installment in U.S. dollars based upon the exchange rates of the pair of foreign currencies that had experienced the greatest loss of value vis-a-vis the U.S. dollar. The payment option virtually assured that petitioners or their partnerships could satisfy the note at a fraction of its face value. The promotional materials provided to petitioners or their partnerships described the "basket of currency" option to retire the debt incurred in the purchase of a master recording with a purchase price of $351,000 in this manner: On the date of refinancing, LaSalle agrees that 120 foreign currencies, as defined in the advance loan commitment, are "pegged" to the U.S. Dollar. In other words, $100,000 U.S. is equal to the equivalent amount of all other currencies whether they be stated in Pounds, Piastres, Pesos, Cruzeiros, etc. LaSalle agrees that the purchaser may irrevocably elect at the time of first payment to pay off the refinanced debt in either U.S. Dollars or a combination of two other foreign currencies in any year. Assuming that the foreign currency method is elected for paying off the note, 50% of the $7,642 annual debt service must be *307 paid off out of the 60 currencies grouped in Basket "A" and the other 50% from the other 60 currencies grouped in Basket "B". Between 1969 and 1979, the International Monetary Fund Yearbook of 1980 shows how foreign currencies fared against the U.S. Dollar. By reference to the Preliminary Information document dated March 1, 1982, you will see that by using the foreign currency method, historically an expense of $22,087 eliminates the original $764,245 refinanced amount, plus $1,005,316 interest accrued from the 10th through the 20th year for a total of $1,769,561. The currencies included in the "basket of currency" option are as follows: (I) the basket "A" countries are as follows: Afghanistan, Algeria, Argentina, Australia, Austria, Bahamas, Bahrain, Bangladesh, Barbados, Belgium, Benin, Bolivia, Botswana, Brazil, Burma, Burundi, Cameroon, Canada, Central Africa Republic, Chad, Congo, Cyprus, Denmark, Egypt, Ethiopia, Fiji, Finland, France, Gabon, Gambia, Ghana, Greece, Honduras, India, Indonesia, Iran, Iraq, Israel, Ivory Coast, Jamaica, Japan, Jordan, Kenya, Korea, Kuwait, Liberia, Libya, Madagascar, Malawi, Malaysia, Mali, Malta, Mauritania, Mexico, New Zealand, Nicaragua, *308 Panama, Paraguay, Peru, Suriname, Trinidad and Tobago; and (II) the basket "B" countries are as follows: Chile, Colombia, Costa Rica, Dominican Republic, El Salvador, Ecuador, Germany, Grenada, Guatemala, Guyana, Haiti, Iceland, Ireland, Italy, Lebanon, Mauritius, Morocco, Nepal, Netherlands, Niger, Nigeria, Norway, Oman, Pakistan, Papua New Guinea, Philippines, Portugal, Qatar, Rwanda, Saudi Arabia, Senegal, Seychelles, Sierra Leone, Singapore, Somalia, South Africa, Spain, SriLanka, Sudan, Swaziland, Sweden, Switzerland, Syrian Arab Republic, Tanzania, Thailand, Togo, Tunisia, Turkey, Uganda, United Arab Emirates, United Kingdom, Upper Volta, Uruguay, Venezuela, Western Samoa, Yugoslavia, Yemen Arab Republic, Yemen P.D. Republic, Zaire, Zambia. The following schedule showing the rapid devaluation of several unstable currencies was included in the Jerden promotional materials: CURRENCY SCHEDULE
1969
1970
1971
1972
1973
1974
INFLATION ADJUSTED
DOLLAR VALUE
USA $100,000
94,100
90,054
87,083
81,597
72,703
BASKET
ARGENTINA
PER US $100,000
(A)
87,500
70,000
70,000
70,000
70,000
CHILE
PER US $100,000
(B)
83,333
62,500
40,000
2,778
535
BRAZIL
PER US $100,00
(A)
87,787
77,196
69,991
69,935
58,507
COLOMBIA
PER US $100,000
(B)
93,531
85,380
78,365
72,036
62,495
ICELAND
PER US $100,000
(B)
100,000
100,777
89,989
104,881
74,346
ISRAEL
PER US $100,000
(A)
100,000
83,333
83,333
83,333
58,333
PERU
PER US $100,000
(A)
100,000
100,000
100,000
100,000
100,000
TURKEY
PER US $100,000
(B)
60,569
63,886
63,886
63,886
64,617
URUGUAY
PER US $100,000
(B)
100,000
67,567
34,153
26,680
15,096
*309 CURRENCY SCHEDULE
1969
1975
1976
1977
1978
1979
INFLATION ADJUSTED
DOLLAR VALUE
USA $100,000
66,015
62,187
58,145
53,785
47,708
BASKET
ARGENTINA
PER US $100,000
(A)
5,747
1,275
586
349
216
CHILE
PER US $100,000
(B)
117
57
35
29
25
BRAZIL
PER US $100,00
(A)
47,960
35,236
27,102
20,793
10,228
COLOMBIA
PER US $100,000
(B)
54,182
49,170
47,045
43,731
40,768
ICELAND
PER US $100,000
(B)
51,580
46,441
41,342
27,695
22,309
ISRAEL
PER US $100,000
(A)
49,295
40,000
22,742
18,401
9,900
PERU
PER US $100,000
(A)
86,000
55,787
29,682
19,726
15,472
TURKEY
PER US $100,000
(B)
59,669
54,245
46,494
35,801
25,572
URUGUAY
PER US $100,000
(B)
9,157
6,250
4,621
3,544
2,953
SOURCE: CONSUMER PRICE INDEX, EXCHANGE RATES. INTERNATIONAL FINANCIAL STATISTICS, INTERNATIONAL MONETARY FUND YEARBOOK 1980 The following presentation concerning payment of the final balloon installment under the "basket of currency" option was made to Jerden investors. The discussion refers to the currency schedule reproduced immediately above. Now, on the currency schedule, we're going *310 to go to year ten on the currency schedule and we're going to kind of go up and down on the schedule and you can see that some are very high and some are very low. That's the remaining value of $100,000 of all these foreign currencies. By going back to the first one, which is Argentina, you can see that Argentina's currency has declined from a value of $100,000 down to $216. That happened because in 1975, you can see Argentina began experiencing catastrophic inflation and their dollar dropped from $70,000 to $5,747 to $1,275, etc. until it got to a total of $216. Chile, in Basket B, was worth $25 at that point because back here in 1972, Allende got in as a dictator and absolutely debauched the currency of Chile during that period of time and dropped it almost to being valueless - only being worth $25. So, naturally, we're going to be using Argentina Pesos to make 50% of our debt service and Chilean Pesos to make the other 50% of our debt service. Now, let's see the impact of that on the other schedule. Now, don't forget, we have to pay out a $1,700,783 in debt service here in the twentieth year. Let's see how much it costs us. Going back to the actual debt service, we can see *311 in Argentinian Pesos, we have to pay $1,837 U.S. to come up with enough Argentine Pesos to pay off $850,000 worth of debt service. In the next column, Chile's even better. In Chilean Pesos, all we have to come up with is $212 U.S. to pay off the other $850,000 worth of debt service required under the note so the total U.S. dollars required is $2,049 to retire $1,700,000. * * * LOB was incorporated on April 1, 1980, under the laws of the Colony of Montserrat, British West Indies, which allowed LOB to carry on banking business in currencies other than East Caribbean dollars outside Montserrat. On April 4, 1980, C. Johnston and Goodwin purchased 100 percent of the stock of LOB. At all times relevant hereto, C. Johnston and Goodwin exercised complete dominion and control over LOB for their sole, joint personal benefit. LOB maintained a single checking account at Seattle First National Bank (Seafirst no. 84-21703). The major sources of deposits into Seafirst no. 84-21703 were loan commitment fees from investors in Jerden master recordings, purchases of LOB stock (mainly by entities also under the control of C. Johnston and Goodwin), and interest on term deposits. These deposits *312 were almost entirely offset by withdrawals from Seafirst no. 84-21703 payable directly to C. Johnston and Goodwin or to nominee entities. LOB never held itself out to the general public as a banking institution nor transacted banking business with the general public. On May 29, 1981, Jerden and LOB executed a partnership agreement whereby Jerden agreed to contribute the long-term notes executed by petitioners or their partnerships and other investors in Jerden master recordings for a 50 percent partnership interest. In return for the remaining 50 percent partnership interest LOB agreed to contribute voting preferred stock. The ostensible purpose of the partnership, called Record Collections Company, was to collect the 50 percent share of net income received from the sale of records by First American payable under the Jerden notes. It was anticipated that, upon the maturity of the Jerden notes, Record Collections Company would be dissolved. Upon dissolution LOB would receive the Jerden notes and security agreements and Jerden would receive the LOB preferred stock. A total of 102 Jerden notes executed by petitioners or their partnerships and other investors were assigned to *313 Record Collections Company on the date they were executed. Record Collections Company was dissolved on December 30, 1982. The partnership never collected any moneys due under the Jerden notes. Despite the purported assignment of the Jerden notes to Record Collections Company, Jerden personnel still treated the notes as assets of Jerden. Sometime prior to October 15, 1982, Dennis Herbert, vice president of Jerden, attempted to pledge these notes as collateral for a bank loan. The notes were refused as collateral. Petitioners did not make all payments due under the terms of the long-term note. Of the loan commitment fees agreed to be paid, Secoy paid not more than $7,455 in 1981 and $7,455 in 1982; Low paid not more than $1,505 in 1981, $1,502 in 1982, and $700 in 1984; Emerald Isle paid not more than $69,335 in 1982, $16,379.50 in 1983, and $10,450 in 1984. None of the 102 makers of long-term notes given in the master recording transactions paid off the fixed amount debt service due in 1984 and 1985. On October 15, 1984, a solicitor for LOB wrote to Jerden investors as follows: Re: ADVANCE LOAN COMMITMENTS AND TEN YEAR RECOURSE NOTES
As you are aware, in 1981 and/or *314 1982, you requested that LaSalle Overseas Bank, Ltd. (LOB) make an advance loan commitment to you as borrower, to pay off your outstanding indebtedness, if any, to Jerden Industries, Inc. or assigns upon maturity of the ten year recourse note. Be advised that LOB, as the result of the dissolution of Record Collections Company, is now the owner and holder of the ten year recourse notes. For those loan commitment holders who have not paid their 1983 or 1984 loan commitment fees (LCF), this is to inform those individuals that, unless payment in full of all past due loan commitment fees (duplicate billing enclosed) is received by LOB on or before 31st October, 1984, LOB will consider the advance loan commitment to be in default and it will enforce the terms and conditions of the advance loan commitment. In addition, please be advised that since LOB is the owner and holder of the ten year recourse note, that the makers of the note must understand that LOB has to take all legal measures available to collect all principal and interest due including the annual debt service due beginning on the first day of the fourth year and continuing through the tenth year (seven annual *315 payments plus balloon payment of final balance) on all aforesaid ten year recourse notes (billing enclosed). In conclusion, any failure to pay loan commitment fees and/or any debt service due could result in constructive or actual foreclosure on your master, loss of all past, present and future tax benefits, as well as enforcement of the terms and conditions of both the advance loan commitment and the ten year recourse note. On June 27, 1985, LOB, enclosing a copy of the October 15, 1984, letter offered to refinance the original long-term note effective January 1, 1986, rather than at maturity upon an immediate small principal payment and execution of a new 10-year note for the face amount of the original note plus accrued interest through December 31, 1985, less the small principal reduction. The letter directed that the payment and the newly executed note should be sent to LOB on or before August 1, 1985, and contained the following paragraph: Upon receipt by LOB your check with the newly executed ten year recourse note, LOB will return your original ten year recourse note stamped paid. It is important that you have evidence of payment of debt and refinancing because in the *316 event of IRS audit, you will have to provide the IRS with evidence that all contractual obligations were paid and are satisfied. On December 10, 1985, LOB sent to Jerden investors a letter signed by C. Johnston stating in part as follows: RE: CONSEQUENCES TO MAKER FOR FAILURE TO PAY DEBT SERVICE PAYMENTS DUE UNDER RECOURSE NOTE AND FAILURE TO PAY LOAN COMMITMENT FEES DUE UNDER THE ADVANCE LOAN COMMITMENT Dear [investor]: Find enclosed a copy of an opinion letter by Rodney J. Waldbaum, attorney for Melvin and Dorothy McCain vs. Commissioner of Internal Revenue Service, Judge Goffe presiding, U.S. Tax Court Seattle, October 28 to November 1, 1985. His opinion letter was prepared after conclusion of this four and half day trial. All of you received a letter from Mr. McCain dated October 21, 1985, asking for your financial support. We are supporting Mr. McCain in his endeavor, and we strongly recommend that you do likewise. The transcript of this case was 935 pages long. From this Court Record we are enclosing pages 813 to 821 inclusive since they show that Judge Goffe ruled that the McCains had proved a Prima Facie case for the deductibility of the loan commitment fee and, *317 therefore, the validity and enforceability of their original ten-year recourse note (ORIGINAL NOTE) involved in the purchase of McCain's master. This ruling was made prior to the IRS putting on its case, which tried to allege that LaSalle Overseas Bank, Ltd. (L.O.B.) had no substance. A final decision on the overall case is not expected for approximately one year. We urge you all to read these nine pages from the Tax Court Record. We have underlined what we consider to be those of significance. They are: -- The names of all ORIGINAL NOTE holders are known to IRS (page 813). -- IRS knows that L.O.B. has not been paid either debt service or loan commitment fees (page 814). -- ORIGINAL NOTE holders felt that they were fully at recourse on the debt (page 816). -- IRS knows, and is watching to see if L.O.B. will enforce and collect its notes (pages 818, 819, 820). -- McCains made a Prima Facie case that their loan commitment fee was deductible and, with regard to L.O.B., the McCains made a Prima Facie showing with the case they put on (page 821). By reference to the letter from L.O.B. dated June 27, 1985, L.O.B. offered to refinance your ORIGINAL NOTE as of December 31, 1985, provided *318 that makers reduce their ORIGINAL NOTE by making a principal payment in the amount stated therein, and below, as well as executing a new ten-year recourse note (RENEWAL NOTE), dated January 1, 1986, which also was sent to you with that letter. Upon receipt of your check, dated not later than December 31, 1985, and newly executed RENEWAL NOTE, L.O.B. will return your ORIGINAL NOTE to you, stamped "paid by renewal", thereby permitting the maker to pay off the RENEWAL NOTE using either "U.S. dollars" or "basket of currencies" options. See RENEWAL NOTE dated January 1, 1986, sent to you June 27, 1985. Once L.O.B. receives your check and executed RENEWAL NOTE, you, the maker, will pay no further loan commitment fees or debt service to L.O.B. under the advance loan commitment and the ORIGINAL NOTE respectively. For those makers who do not refinance and who remain in default, by not honoring their debt service commitments under the ORIGINAL NOTE, irrespective of whether they have settled with the IRS, be advised that L.O.B. will foreclose on the master effective December 31, 1985. The master owner will then be unable to continue using the master. Assuming that investment tax credit *319 and depreciation deductions have been claimed and have not been challenged and disallowed, the master owner will be subject to both investment tax credit and depreciation recapture in 1985 by the taxing authorities, as well as remaining fully liable at maturity for paying L.O.B. the full principal of the ORIGINAL NOTE, plus all accrued interest. If you do not wish to pay the loan commitment fees and the annual debt service for at least five more years, depending upon the maturity of the original note, and if you wish to have both the "U.S. dollars" and "basket of currencies" options available to you now, we most strongly urge you to accept L.O.B.'s "refinance plan", effective December 31, 1985. Please forward your check in the U.S. dollar amount of * * *, which is for debt reduction of the ORIGINAL NOTE and, therefore, is not tax deductible. Make your check payable to LaSalle Overseas Bank, Ltd. and mail it, together with an executed copy of your RENEWAL NOTE dated January 1, 1986, to: Clifford M. Johnston, 710 North 34th Street, Seattle, Washington 98103, before December 31, 1985. If you have any questions, call either Cliff Johnston or P. E. (Ted) Goodwin at * * *. In *320 December 1985 or January 1986, Secoy and Low agreed to refinance their obligations with LOB, making payments of $15,221.00 and $2,076.36, respectively. As of trial of this case in May 1986, Weldon had not made any further payments or executed any refinancing documents. As of March 25, 1983, no more than two of the master recordings purportedly purchased by petitioners or their partnerships had been released. First American planned to market cassette tapes, not albums, from the masters at prices of approximately $2.00 or $2.50 per tape and projected the following expenditures of money and release dates for the titles in issue: Money for
Album Name
Production
Release Date
Diana Honey
$2,400
Aug.-Sept. 1983
Lonesome City Kings
2,400
Oct.-Nov. 1983
Thielemans/Svend
300
Nov.-Dec. 1983
Johnny Horton
300
Nov.-Dec. 1983
Ian Matthews
300
Dec. 1983-Jan. 1984
Buddy Rich
300
Dec. 1983-Jan. 1984
Files of First American reflecting expenditures in relation to the recordings in issue reflect only the following expenses: Title
Amount
Date
Toots Thielemans
$356
Mar. 1982
Johnny Horton
3,240
Oct. 1983-Jan. 1984
Buddy Rich
91
Jan. 1982
Diana Honey
259
Oct. 1982-Sept. 1983
Mark Winkler
12,944
Oct. 1981-Feb. 1983
Lonesome City Kings
127
Nov. 1983
Ian Matthews
667
Sept.-Dec. 1982
Hi-Fi Moods for Mallards
14,051
Mar. 1982-Dec. 1982
*321 At most a few hundred audio cassette copies of the master recordings in issue were ever produced. After the transactions in question, First American began sending petitioners or their partnerships bi-quarterly statements reporting purported sales performance of the master recordings. In fact, no sales had occurred and the reports merely reflected the accrual of the "guaranteed sales" assured in the sales agency agreements. Neither petitioners nor their partnerships received any cash from the purported sales. Subsequent to the transactions entered into with Jerden, petitioners failed to take any steps necessary to successful marketing of the master recordings, other than minimal inquiries to Goodwin or C. Johnston. None of petitioners made any effort to inform himself of the steps necessary to successful marketing or otherwise to educate themselves about the recording industry. None of petitioners fully understood the documents that he had executed or the financial obligations that he had purportedly undertaken. None of petitioners made any substantial effort to determine if or when the master recordings were placed in service and if or when copies in an amount necessary *322 to successful commercial exploitation had been produced. None of them advanced the costs of producing marketable quantities of records or cassettes from their respective master recordings. In December 1982, Dennon sold Jerden to Pathe Discos, Ltd., and appears to have resigned as president and director. Pathe Discos, Ltd., became a United Kingdom corporation on May 1, 1981. Prior to that time Pathe Discos, Ltd., had no separate legal existence. Dennon arranged for the incorporation of Pathe Discos, Ltd., through attorneys in Seattle and London. Pathe Discos, Ltd., was to be owned by a Danish shell company owned by a business associate of Dennon's, David Hubert. At all times relevant to this case, Pathe Discos, Ltd., was under the direct control of Dennon. In January 1983, Dennon sold First American to Dennis A. Herbert and resigned as its president. Herbert, who had been vice president of Jerden and First American, became president of First American. On May 9, 1984, First American filed for bankruptcy. Following the demise of First American, petitioners made no independent efforts to promote or market their master recordings. On their tax returns for the years in issue, *323 petitioners claimed 10 percent investment tax credits and deducted depreciation and loan commitment fees based on their proportionate share in the stated purchase price of the master recordings. OPINION Procedural Matters
Approximately a month before the date set for trial of the above cases, petitioners moved for a continuance based upon the pendency in the Ninth Circuit Court of Appeals of two cases, United States of America v. Leland G. Stahl and United States of America v. Ronald W. Matheson, in which the validity of the Sixteenth Amendment to the United States Constitution was challenged. Those motions were denied. At the time the cases were called for trial, petitioners moved to amend their petitions to assert the invalidity of the Sixteenth Amendment as well as an alternative theft loss theory. Amendments were unopposed and allowed as to the theft loss theory. The motions to amend with respect to the questioned validity of the Sixteenth Amendment were denied, however, because, in the Court's view, petitioners' theory was erroneous as a matter of law with respect to the questioned validity of the Sixteenth Amendment. The Court indicated that, in the event *324 that the convictions of the defendants in the Stahl and Matheson cases were reversed by the Court of Appeals for the Ninth Circuit, the record in these cases would be reopened. The Court also gave permission to petitioners to argue the correctness of the Court's ruling in their briefs. In their briefs, they assert that the Court erroneously denied the motions to amend because the invalidity of the Sixteenth Amendment would render this Court without jurisdiction. The evidence and argument that petitioners tendered in support of their motions to continue and to amend were the same as those rejected in other cases including United States v. Stahl,792 F.2d 1438 (9th Cir. 1986), cert. denied    U.S.    (Jan. 12, 1987). See also United States v. Ferguson,793 F.2d 828 (7th Cir. 1986); United States v. Foster,789 F.2d 457 (7th Cir. 1986); and United States v. Thomas,788 F.2d 1250 (7th Cir. 1986). The Court sees no reason to reconsider its ruling. The amendments would be futile in view of the now final determination of the Court of Appeals for the Ninth Circuit in United States v. Stahl,supra. *325 See Klamath-Lake Pharm. Assn. v. Klamath Med. Serv. Bureau,701 F.2d 1276, 1293 (9th Cir. 1983). McCain v. Commissioner, T.C. Memo. 1987-285
The parties in these cases have incorporated in haec verba the entire record, including the briefs, in the case of McCain v. Commissioner,T.C. Memo. 1987-285. [6] We here incorporate by reference and adopt the reasoning in McCain, filed today. Specifically, as in McCain, we conclude that the Jerden master recording transactions contain all of the elements of generic tax shelters as identified in Rose v. Commissioner,88 T.C. 386, 412 (1987), as follows: (1) Tax benefits were the focus of promotional materials; (2) the investors accepted the terms of purchase without price negotiation; (3) the assets in question consist of packages of purported rights, difficult to value in the abstract and substantially overvalued in relation to tangible property included as part of the package; (4) the tangible assets were acquired or created at a relatively small cost shortly prior to the transactions in question; and (5) the bulk of the consideration was deferred by promissory *326 notes, nonrecourse in form or in substance. * * * We, therefore, apply a unified approach emphasizing objective factors and, for the reasons set forth below, conclude that petitioners are not entitled to the investment tax credits claimed or to any deductions in relation to their transactions with Jerden Industries, Inc., and related entities. *327 The Dealings Between Petitioners and Jerden, First American, Et Al.
Petitioners argue that Secoy, for himself, and Low, for Ridgewood Associates, did the best that they could to monitor their investment in master recordings in view of their limited background and limited time to spend on this activity. Low testified that he browsed through Billboard magazine on "a couple of occasions," and he knew some musicians when he was in high school. Petitioner Weldon, admitting total ignorance of the record industry, asserts that he was entitled to rely on the general partners of Emerald Isle, F. Johnston, and Watts. Petitioners assert that they should be held to a lesser standard than other individuals, such as McCain, because they were not sophisticated. This argument would put a premium on gullibility. In any event, it is inconsistent with the concepts set forth in regulations promulgated under section 183, which expressly direct consideration of the expertise of the taxpayer or his advisors (section 1.183-2(b)(2), Income Tax Regs.) and the time and effort expended by the taxpayer in carrying on the activity (section 1.183-2(b)(3), Income Tax Regs.) as factors in determining *328 whether an activity is engaged in for profit. The promotional materials received by petitioners from C. Johnston and Goodwin focused almost exclusively on tax benefits. Except for Weldon's conversations with his accountant concerning the purported tax benefits, they did not consult anyone with tax expertise. Although Secoy and Low were aware of ongoing IRS challenges to Jerden promotions, they ignored all warning signs, including the "Tax Risks" listed in the promotional materials. They now claim that successful marketing was prevented by IRS investigations; this contention would be laughable were it not so perverse. At no time did petitioners seek the advice of any independent person familiar with the music or record industry about the merits of purchasing a master recording. They did not receive appraisals of the master recordings before agreeing to pay the alleged purchase price. The evidence is inconclusive as to whether they sought or received projections of potential sales of the number of copies to be produced from the master recordings. They have not produced or described in detail any such projections. If, however, they received the projections received by McCain, the *329 assumed sales were totally unrealistic and patently unreasonable. As petitioners affirmatively assert, they engaged in no price negotiation and agreed to pay whatever Jerden had set as the price for a master. None of them even listened to the recordings before agreeing to the purchase transactions. The choice among different prices set by Jerden appears to have been made on the basis of the tax benefits sought rather than on any evaluation of the master. [7] There is no evidence that any of petitioners or their partnerships ever advanced any money to First American to produce any copies of the master recordings. There were certainly no efforts to produce the number of copies necessary to return the cash payments, much less to pay off any part of the long-term debt. *330 Petitioners have produced no evidence that Jerden had title to any of the master recordings in issue. As to some of the masters, Jerden documents purporting to show ownership were produced. Those documents are internally inconsistent, impeached by other documents and patently unreliable. Respondent has shown that four or five of the masters were the subject of licenses or sublicenses to First American from third parties. Petitioners now concede that "Jerden may have had only a license, rather than full title to petitioners' masters when it sold the masters to petitioners," but they assert that petitioners could rely on Jerden's warranty that it was conveying full title to petitioners. Minimal inquiry would have disclosed the absence of title in Jerden, and the purported size of the transactions certainly justified minimal inquiry. Again, petitioners' stance was one of indifference. Giving them the benefit of doubt as to their good faith, "in their haste to obtain tax deductions, taxpayers have put their common sense behind them and have become easy targets for tax shelter charlatans." Saviano v. Commissioner,765 F.2d 643, 654 (7th Cir. 1985), affg. 80 T.C. 955 (1983). *331 Although they claim they were in telephone contact with Goodwin, C. Johnston, Dennon, and other persons from time to time concerning their investment, petitioners have not documented any specific inquiries or shown any reasonable effort to assure the profits that they purportedly anticipated. Their purported telephone contacts are far less than the post-acquisition activities engaged in by the taxpayers in Rose v. Commissioner,supra. We are not persuaded that petitioners were any less indifferent to the marketing success of the assets they purportedly acquired than the taxpayers who failed to secure tax benefits in Estate of Baron v. Commissioner,83 T.C. 542 (1984), affd. 798 F.2d 65 (2d Cir. 1986), and other master recording cases. [8] See also Beck v. Commissioner,85 T.C. 557, 573-574 (1985). These are certainly cases where "greater weight is given to objective facts than to the taxpayer's mere statement of his intent." Section 1.183-2(a), Income Tax Regs.
*332 Weldon claims reliance on the "expertise" of F. Johnston and Watts, the general partners of Emerald Isle. F. Johnston was merely a tax shelter salesman whose main sales pitch emphasized, according to his testimony, that the "recourse" financing of the transactions "makes or preserves the integrity of the tax structure." He testified that he read or was familiar with music industry publications, i.e., he read Billboard magazine "once or twice" in 1981 and 1982. In Watts v. Commissioner,T.C. Memo. 1985-531, we concluded that Watts' master recording activities were directed only at hoped for tax benefits. Petitioners try to avoid that characterization by asserting that Watts subsequently developed experience in the music industry. The experience they rely upon, however, consists of purported talent scouting by Watts among various bars and taverns in the Seattle area. Although they had each invested in master recordings on other occasions, none of petitioners or Watts ever showed significant gross receipts from sales of records or cassettes, much less profit. See section 1.183-2(b)(5) (the success of the taxpayer in carrying on other similar or dissimilar *333 activities), (6) (the taxpayer's history of income or losses with respect to the activity) and (7) (the amount of occasional profits, if any, which are earned), Income Tax Regs. None of petitioners or their partners have shown that their interest in the music industry extended beyond "elements of personal pleasure or recreation." Section 1.183-2(b)(9), Income Tax Regs. In summary, petitioners were totally unbusinesslike in the manner in which they carried on the activities. Section 1.183-2(b), Income Tax Regs.
We acknowledge that Dennon and First American were, at least in part, engaged in the music business. The more profitable aspect of their business, however, was tax shelter promotion. Our conclusion as to his activities is that they were just as described in the March 1982 newspaper article quoted above in our findings (p. 12, supra), i.e., "nobody really cares what happens to the records." See also Beck v. Commissioner,85 T.C. at 579-580. The dealings between petitioners, on the one hand, and Jerden and its related entities, on the other, can be explained only in terms of anticipated tax benefits and not as any indication of economic substance. *334 Relationship Between Fair Market Value and Purchase Price
Petitioners presented no evidence of fair market value of the subject masters. Respondent's experts, Thomas L. Bonetti and John F. Wiedenmann, appraised the master recordings in issue here as follows: Title
Price
Fair Market Value
Toots Thielemans
$452,000
$2,000 (Wiedenmann)
500 (Bonetti)
Johnny Horton
533,000
7,500 (Wiedenmann)
1,000 (Bonetti)
Buddy Rich
533,000
6,000 (Bonetti)
Diana Honey
533,000
5,000 (Wiedenmann)
Ian Matthews
533,000
5,000 (Wiedenmann)
Lonesome City Kings
533,000
5,000 (Wiedenmann)
Mark Winkler
533,000
5,000 (Wiedenmann)
Hi-Fi
533,000
5,000 (Wiedenmann)
Master recordings in which petitioners had invested in other transactions and in other years, with alleged purchase prices ranging from $850,000 to $1,225,900, were appraised by respondent's experts as having values ranging from $500 to $15,000. Petitioners testified that they received sales projections verbally or in writings that they did not retain. They also received purported appraisals after they entered into the transactions. The lack *335 of reliability of projections and appraisals provided by Jerden and its sales representatives is fully discussed in McCain, and we see no reason to repeat that analysis when there is no such evidence specifically related to the masters in issue here. There is no factual support for the large values claimed by petitioners. We can only conclude from the evidence that the actual fair market values of the master recordings in issue did not exceed the amounts determined by respondent's experts as set forth above. The only reasonable inference from the evidence is that the cash required of petitioners was paid with the expectation that it would be more than recouped by a 10 percent investment tax credit and depreciation deductions to be claimed for the year of the transactions. For the reasons discussed below, we do not believe that petitioners ever intended to pay the face amount of the long-term notes. We do not, therefore, give the agreed "purchase price" any weight as evidence of fair market value. See Rose v. Commissioner,supra at 418. Compare Taube v. Commissioner,88 T.C. 464, 487-488 (1987). Structure of the Financing
The *336 gimmickry involved in the "basket of currency" option is fully explained in McCain, and we incorporate and adopt that discussion in full. In summary, no payments were anticipated that would in reality be more than a small fraction of the face value of the notes. Petitioners here affirmatively assert that they expected to profit by paying off the notes in devalued currencies, thereby confirming the lack of reality to the face amount of the notes. They argue that they would pay tax on the gains realized on extinguishment of the debt. If correct, later consequences are irrelevant in the context of deductions and tax credits available only if the face amount of the notes reflects a certain (i.e., noncontingent) liability as of the date of the transaction. See Waddell v. Commissioner,86 T.C. 848, 901-903 (1986), on appeal (9th Cir., Jan. 20, 1987), and cases there cited. Although the notes were labeled "recourse," LOB obtained no information about the assets of petitioners available to satisfy the alleged liability. The demands for payment and offers of refinancing were patently designed and expressly offered to provide "paid" notes to bolster the tax claims *337 of the parties. The notes represented a flimsy attempt to overcome changes in the tax law with respect to determinations of amounts "at risk" and to overcome challenges that had arisen in tax shelter arrangements using nonrecourse financing. We conclude that the long-term notes were illusory and that the transactions as a whole lacked economic substance. There is no evidence or reason to believe that Congress intended to confer tax benefits on activities of the sort engaged in by petitioners. See McCain at 49-50. Thus the transactions do not give rise to the deductions for depreciation or "loan commitment fees" or to the investment tax credits claimed by petitioners. [9]
Theft Loss Deduction Under Section 165
As in McCain, petitioners contend that, if we disallow the deductions and credits that they claim, they are entitled to deductions under section 165(c)(3) for theft losses to the *338 extent of their cash investment. Again we incorporate and adopt the discussion in McCain. See West v. Commissioner,88 T.C. 152 (1987). Petitioners have not shown that they suffered a theft. They purchased a package of purported tax benefits with the attendant risks set forth in the materials. They took those risks voluntarily and must now bear the consequences. Moreover, none of petitioners who testified at trial knew whether or not they had suffered a theft loss. On brief they contend that they cannot discover such a loss "until there is a judicial determination of title to the masters." It is thus apparent that petitioners cannot claim a theft loss during the years in issue in these cases, in that they do not even claim to have discovered the loss during those years. See section 1.165-8(a)(2), Income Tax Regs.[10]
*339 Additions to Tax Under Section 6659
Because we have found that the transactions between petitioners and Jerden lacked economic substance, they cannot be recognized for tax purposes. Thus petitioners have no adjusted basis for purposes of depreciation or investment tax credit. See McCain v. Commissioner,supra; see also Rose v. Commissioner,supra;Zirker v. Commissioner,87 T.C. 970, 979-980 (1986). Under section 6659(c) a valuation overstatement occurs if the adjusted basis of any property claimed on any return is 150 percent or more of the amount determined to be the correct amount of such adjusted basis. Here the values claimed on the tax returns, based on the exaggerated purchase prices claimed, far exceeded 250 percent of the correct basis, which is zero. Thus an addition to tax equal to 30 percent of the underpayment attributable to the valuation overstatement is appropriate. Section 6659(a) and (b). Petitioners here, as in McCain, argue that the "section 6659(e) waiver should apply for each petitioner." [11] That section, however, provides for a waiver by "the Secretary" and not for a determination *340 by the Court. Assuming that such waiver would be an exercise of discretion subject to review by the Court, we would find no abuse of discretion in these cases. As indicated above, petitioners did not even see appraisals before they agreed to the prices demanded by Jerden. We see no reasonable basis for the adjusted basis claimed on petitioners' returns, and we doubt that those claims were made in good faith. Additional Interest Under Section 6621(c) [Formerly Section 6621(d)]
As in McCain, we conclude that section 6621(c) applies to the underpayments in issue to the extent that they exceed $1,000 and are (1) investment tax credits or depreciation deductions resulting from a valuation overstatement or (2) loan commitment fees or other deductions arising from a tax-motivated transaction. See section 6621(c)(2) and (3)(A)(i) and (B) and section *341 301.6621-2T, A-4(1) and (2), Proced. & Admin. Regs. (Temp.), 49 Fed. Reg. 59394 (Dec. 28, 1984). See also Rose v. Commissioner,supra.
Additions to Tax Under Section 6653(a)
It is not necessary to repeat here in full the analysis of petitioners' dealings with Jerden, set forth above in determining that the transactions in issue lacked economic substance, to conclude that the deficiencies attributable to the master recordings are due to negligence or to intentional disregard of rules and regulations. None of petitioners reasonably relied on anyone as to (1) whether he acquired sufficient interest in a master recording to claim depreciation or investment tax credit; (2) whether the master was placed in service during the year; (3) what the correct basis of the master was for tax purposes; or (4) how the transaction should be treated on his tax returns. Moreover, they all ignored the "Tax Risks" set forth in the promotional materials; Secoy and Low also ignored questions that had been raised during IRS investigations of their prior years' returns and/or Jerden. The additions to tax under section 6653(a) are fully justified. Other Observations
*342 Petitioners repeatedly assert that their masters were placed in service during the years in which they claimed investment tax credits and depreciation deductions. They have not, however, cited any evidence in support of those assertions. The files of First American reflect that, as of March 25, 1983, six of the master recordings in issue had not been released. No significant number of copies of the masters were ever produced. In our determination that the transactions lacked economic substance, we have taken into account the failure of petitioners to confirm the status of their recordings at any particular time. Our determination responds to arguments of the parties and disposes of all issues. It is apparent, however, that petitioners have not proven the prerequisites to investment tax credits or depreciation deductions. See sections 38(a), 46(a)(1), 46(a)(2), 46(c)(1); sections 1.46-3(a)(1), 1.167(a)-10(b), 1.167(a)-11(e)(1)(i), Income Tax Regs. See also Rockwell v. Commissioner,512 F.2d 882 (9th Cir. 1975), affg. a Memorandum Opinion of this Court, and Rule 142(a), Tax Court Rules of Practice and Procedure.
We here repeat our warning in McCain and *343 in the cases there cited (slip opinion at pp. 58-60), that repetitious proceedings of this nature justify an award of damages under section 6673. Specifically with respect to taxpayers' claims of invalidity of the Sixteenth Amendment, damages were affirmed and additional sanctions were awarded in Pollard v. Commissioner,816 F.2d 603 (11th Cir. 1987), affg. an unpublished order of this Court. Taxpayers similarly situated are thus on notice of the increasing likelihood of awards of damages in appropriate cases. Decision will be entered for the respondent in docket No. 7825-85.
[12]
Decisions will be entered under Rule 155 in docket Nos. 5280-85, 13512-85, and 13513-85.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Patrick E. Saty and Regina M. Saty, docket No. 7443-85; Patrick M. Low and Pamela L. Low, docket No. 7825-85; Ronald A. Weldon, docket No. 13512-85; and Ronald A. Weldon and Carol M. Weldon, docket No. 13513-85.↩
2. Unless otherwise specified, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue. * plus an amount to be determined (i.e., 50 percent of the interest due on the underpayment attributable to negligence) under section 6653(a)(2).↩
3. Subsec. (d) of sec. 6621 was redesignated subsec. (c) and amended by the Tax Reform Act of 1986, Pub. L. 99-514, sec. 1511(c)(1)(A)-(C), 100 Stat. 2744. We use the reference to the Internal Revenue Code as redesignated and amended.↩
4. See Watts v. Commissioner,T.C. Memo. 1985-531↩.
5. Respondent contends, and we conclude, that petitioners did not acquire valid title to the master recordings. For convenience, however, in this opinion we sometimes refer to the recordings as if they belonged to petitioners.↩
6. The proposed findings of fact in respondent's 260-page opening brief repeat for no apparent reason findings material only to the McCain case and are in substantial part recitals of evidence ("Exhibit     is    ," "[the witness] testified * * *,") in this case, the McCain case, and Watts v. Commissioner,T.C. Memo. 1985-531. See Rule 151(e)(3), Tax Court Rules of Practice and Procedure. Notwithstanding our disagreement with the facts as stated in petitioners' proposed findings, we appreciate the effort to dedicate their brief to evidence different from that in McCain,↩ to organize their proposed findings in logical, chronological, order and limit them to material facts, and to respond to the Court's comments at the close of the trial. Partly as a result of dealing with the briefs in these cases, the Court anticipates setting limits on the number of pages in briefs in future comparable cases.
7. Secoy testified at trial as follows: Q. Did you audition the Toots Thielemans recording before you decided to purchase it? A. No, I didn't. I received a demo, or whatever they call them, tape, soon afterwards and -- Q. A reference cassette? A. It was a cassette that I received. Q. How long after the purchase did you receive that? A. It was shortly. I can't tell you. It had -- it didn't have Side A or Side B. I notice that it played for about 38 minutes, so I was interested the other day, when I saw the finished cassette, to note that they had deleted two of the songs. Because of space requirements on Side A and Side B, they had to pull about three minutes of each -- pulled out six minutes off the recording. Q. Did they pull complete songs off or portions? A. Yes, they pulled two complete songs. Q. Were you familiar with any of the other selections, the identities of the artists, of the other selections that you were offered? A. I really didn't spend any time looking at them. I'll be honest with you. It was sort of an -- I saw what I liked and I liked what I saw, and I just said hey, fine, this is it.↩
8. Flowers v. Commissioner,80 T.C. 914 (1983); Hawkins v. Commissioner,T.C. Memo. 1987-233; Harmon v. Commissioner,T.C. Memo. 1986-305; Grace v. Commissioner,T.C. Memo. 1986-304; Seely v. Commissioner,T.C. Memo. 1986-216; Holland v. Commissioner,T.C. Memo. 1985-626, on appeal (9th Cir., July 18, 1986); Watts v. Commissioner,T.C. Memo. 1985-531; Gessler v. Commissioner,T.C. Memo. 1985-390; Looney v. Commissioner,T.C. Memo. 1985-326, affd. without published opinion 810 F.2d 205 (9th Cir. 1987); Call v. Commissioner,T.C. Memo. 1985-318; Cronin v. Commissioner,T.C. Memo. 1985-83; Snyder v. Commissioner,T.C. Memo. 1985-9; and Kovacevich v. Commissioner,T.C. Memo. 1986-513↩.
9. Under Rose v. Commissioner,88 T.C. 386↩ (1987), petitioners would be entitled to deduct any interest actually paid on the short-term notes given as part of their respective down payments. So far as we can tell, however, such interest is not in issue here.
10. Sec. 1.165-8(a)(2), Income Tax Regs., provides as follows: (2) A loss arising from theft shall be treated under section 165(a) as sustained during the taxable year in which the taxpayer discovers the loss. See section 165(e). Thus, a theft loss is not deductible under section 165(a) for the taxable year in which the theft actually occurs unless that is also the year in which the taxpayer discovers the loss. However, if in the year of discovery there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, see paragraph (d) of section 1.165-1.↩
11. Sec. 6659(e) provides as follows: (e) Authority to Waive. -- The Secretary may waive all or any part of the addition to the tax provided by this section on a showing by the taxpayer that there was a reasonable basis for the valuation or adjusted basis claimed on the return and that such claim was made in good faith.↩
12. Petitioners Saty in docket No. 7443-85 have agreed to be bound by our findings with respect to petitioners Low, and the parties stipulated that the decision in docket No. 7443-85 will be submitted when the decision in docket No. 7825-85 becomes final within the meaning of sec. 7481.↩